## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JDS THERAPEUTICS, LLC and<br>NUTRITION 21, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.   15 cv 342 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| SCHWABE NORTH AMERICA, INC. and<br>NATURE'S WAY PRODUCTS LLC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### COMPLAINT

Plaintiffs JDS Therapeutics, LLC and Nutrition 21, LLC (collectively "Plaintiffs") hereby assert claims of patent infringement against Schwabe North America Inc. ("Schwabe") and Nature's Way Products LLC. ("Nature's Way") (collectively, "Defendants"), and allege as follows:

### THE PARTIES

1.      Plaintiff JDS Therapeutics, LLC ("JDS") is a limited liability company organized under the laws of Delaware, having a principal place of business in Purchase, New York.

2.      Plaintiff Nutrition 21, LLC ("Nutrition 21") is a limited liability company organized under the laws of New York, having a principal place of business in Purchase, New York. Nutrition 21 is a wholly-owned subsidiary of JDS.

3.      Upon information and belief, Defendant Schwabe is a corporation organized under the laws of Wisconsin having a principal place of business in Green Bay, Wisconsin.

NY 75239218v5

4.　　　　Upon information and belief, Defendant Nature's Way is a corporation organized under the laws of Wisconsin having a principal place of business in Green Bay, Wisconsin.

5.　　　　Upon information and belief, Nature's Way is a subsidiary of Schwabe.

## JURISDICTION AND VENUE

6.　　　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq*.

7.　　　　This Court has personal jurisdiction, general and specific, over Defendants because, among other things, Defendants are engaged in substantial and not isolated activity within this judicial district by regularly transacting business within this judicial district, regularly selling product within this judicial district, and deriving substantial revenues from sales in this judicial district.  Also, Defendants have performed and continue to perform infringing activity, including selling the accused products, within this judicial district.

8.　　　　Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400.

## NATURE OF THE ACTION

9.　　　　This civil action for patent infringement arises out of the activities of Schwabe and Nature's Way, and/or employees, divisions, subsidiaries, affiliates and/or predecessor entities of Defendants (hereinafter collectively "Defendants"), in making, using, offering to sell, selling and/or importing into the United States nutritional and dietary supplements that combine chromium picolinate in combination with other ingredients, such as nicotinic acid, niacinamide (amide of nicotinic acid), ascorbic acid, citric acid and/or biotin.

10.     Plaintiffs own numerous patents, including the patents asserted in this Complaint, which cover compositions and formulations that include chromium picolinate in combination with other ingredients, such as nicotinic acid, ascorbic acid, citric acid and/or biotin and their equivalents, and uses for such compositions and formulations.  Upon information and belief, Defendants have received notice of and had knowledge of the patents asserted in this action.

11.     Defendants, upon information and belief, have purchased large quantities of chromium picolinate from suppliers other than Plaintiffs with knowledge of the asserted patents, with knowledge that they were combining chromium picolinate from other suppliers with other ingredients such as biotin, ascorbic acid, citric acid, niacinamide and/or nicotinic acid, or their equivalents, in violation of the asserted patents, and with knowledge of their infringement, but without a license from Plaintiffs to use Plaintiffs' patented technology in Defendants' multi-vitamin and dietary supplement product lines.  Defendant's making, using, distribution, offering for sale, sale and/or importation of Defendants multivitamin and dietary supplements purposefully and willfully infringed and continue to willfully infringe the asserted patents, and /or willfully induced others and continues to willfully induce others to infringe the asserted patents.

### THE PATENTS IN SUIT

12.     Plaintiffs and Nutrition 21, Inc. ("N21") are, *inter alia*, developers, marketers, sellers, and suppliers of efficacious, clinically substantiated ingredients to the nutritional and dietary supplement industry.  Plaintiffs' market segments include glucose metabolism and insulin resistance, appetite control and weight management.  In particular, Plaintiffs and N21 sold, sell and market a highly refined dietary form of chromium picolinate, under the brand Chromax®, to

leading nutritional and dietary supplement manufacturers.  Plaintiffs are small entities (as was N21) having intellectual property as one of their primary assets.

13.        Plaintiffs and N21 conceived and developed their intellectual property at much expense and effort, and have developed and maintained an extensive patent portfolio to cover formulations comprising chromium picolinate in combination with other compounds, such as, for example, biotin, ascorbic or citric acid, and/or niacin, and uses for such formulations.

14.        For example, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 5,948,772 ("the '772 patent"), entitled "Chromium Picolinate Compositions and Uses Thereof" on September 7, 1999, to AMBI Inc., later known as N21.  A true and correct copy of the '772 patent is attached as Exhibit A.  JDS received by assignment all rights, title, and interest in and to the '772 patent, including the right to enforce and collect damages for all past, present and future infringements.  By further agreement, Nutrition 21 jointly owns the '772 patent with JDS as co-owners, whereby Nutrition 21 and JDS each have an equal and undivided one-half interest in all rights, title, and interest in and to the '772 patent, including the right to enforce and collect damages for all past, present and future infringements.

15.        Also, the USPTO duly and legally issued United States Patent No. 6,136,317 ("the '317 patent"), entitled "Chromium Picolinate Compositions" on October 24, 2000, to AMBI Inc., later known as N21.  A true and correct copy of the '317 patent is attached as Exhibit B.  JDS received by assignment all rights, title, and interest in and to the '317 patent, including the right to enforce and collect damages for all past, present and future infringements.  By further agreement, Nutrition 21 jointly owns the '317 patent with JDS as co-owners, whereby Nutrition 21 and JDS each have an equal and undivided one-half interest in all rights, title, and interest in

and to the '317 patent, including the right to enforce and collect damages for all past, present and future infringements.  The '317 patent is related to and claims priority to the '772 patent.

16.        Additionally, the USPTO duly and legally issued United States Patent No. 6,251,889 ("the '889 patent"), entitled "Chromium Picolinate Compositions" on June 26, 2001, to AMBI Inc., later known as N21.  A true and correct copy of the '889 patent is attached as Exhibit C.  JDS received by assignment all rights, title, and interest in and to the '889 patent, including the right to enforce and collect damages for all past, present and future infringements.  By further agreement, Nutrition 21 jointly owns the '889 patent with JDS as co-owners, whereby Nutrition 21 and JDS each have an equal and undivided one-half interest in all rights, title, and interest in and to the '889 patent, including the right to enforce and collect damages for all past, present and future infringements.  The '889 patent is related to and claims priority to the '772 patent.

17.        And, the USPTO duly and legally issued United States Patent No. 6,143,301 ("the '301 patent"), entitled "Chromium Picolinate Compositions and Uses Thereof" on November 7, 2000, to AMBI Inc., later known as N21.  A true and correct copy of the '301 patent is attached as Exhibit D.  JDS received by assignment all rights, title, and interest in and to the '301 patent, including the right to enforce and collect damages for all past, present and future infringements.  By further agreement, Nutrition 21 jointly owns the '301 patent with JDS as co-owners, whereby Nutrition 21 and JDS each have an equal and undivided one-half interest in all rights, title, and interest in and to the '301 patent, including the right to enforce and collect damages for all past, present and future infringements.  The '301 patent is related to and claims priority to the '772 patent.

NY 75239218v5

18.     Still further, the USPTO duly and legally issued United States Reissue Patent No. 39,480 ("the Re '480 patent"), entitled "Chromium/Biotin Treatment of Type II Diabetes" on January 23, 2007, to N21.  A true and correct copy of the Re '480 patent is attached as Exhibit E.  The Re '480 patent is a reissue of United States Patent No. 5,929,066 ("the '066 patent"), the scope of claims 1-10 of the Re '480 patent being substantially identical, if not identical, to the scope of claims 1-10 of the '066 patent.  JDS received by assignment all rights, title, and interest in and to the Re '480 patent, including the right to enforce and collect damages for all past, present and future infringements.  By further agreement, Nutrition 21 jointly owns the Re '480 patent with JDS as co-owners, whereby Nutrition 21 and JDS each have an equal and undivided one-half interest in all rights, title, and interest in and to the Re '480 patent, including the right to enforce and collect damages for all past, present and future infringements.

19.     The '772 patent, '317 patent, '889 patent, '301 patent, and Re '480 patent (collectively referred to as "the Patents-in-Suit") relate to compositions comprising chromium picolinate in combination with other compounds, such as, for example, nicotinic acid, ascorbic acid, citric acid and/or biotin, and methods for their use.

20.     The Patents-in-Suit are among approximately 20 patents and pending patent applications owned by Plaintiffs that concern compositions containing chromium and uses thereof.

## BACKGROUND

21.     Defendants are subsidiaries of a multi-billion dollar corporation Schwabe International GmbH with worldwide sales, facilities and resources.  Defendants make, market, offer to sell, sell and distribute, among other products and services, nutritional supplements, dietary supplements and/or multi-vitamins, including nutritional supplements, dietary supplements and/or multi-vitamins within the United States under at least the Nature's Way,

Alive, Doctor's Choice, Alpha Betic, Enzymatic Therapy, and Integrative Therapeutics brands (collectively the "Nature's Way Products").  Defendants make, market, offer to sell, sell and distribute, many, possibly hundreds of, Nature's Way Products.  Nature's Way Products include, among other ingredients, chromium picolinate in combination with ascorbic acid, citric acid, niacinamide, nicotinic acid and/or biotin.

22.     Prior to 2009, and from 2009 through November 2011, N21 sold Chromax® chromium picolinate by weight and its price was dependent upon the volume (weight amount) of Chromax® chromium picolinate purchased by a customer.  As an ingredient supplier, N21 sold Chromax® chromium picolinate to more than one hundred customers who, in many circumstances, upon information and belief, incorporated Chromax® chromium picolinate into multiple product lines and SKUs and even resold Chromax® chromium picolinate to their customers as contract manufacturers.  N21 often had no knowledge of the ultimate end use or products in which its Chromax® chromium picolinate was used or incorporated as an ingredient.

23.     To support its sales, N21 sold its Chromax® chromium picolinate according to a business policy and practice that granted its customers a limited license under the Patents-in-Suit to use Chromax® chromium picolinate in their products and for uses covered by those patents.  The fee for the limited license was bundled on an unallocated basis with the price that N21 charges to its customers for the Chromax® chromium picolinate product that N21 sold to them.  When a customer purchased Chromax® chromium picolinate from N21 it received this limited license to use and practice the Patents-in-Suit, but only for the specific Chromax® chromium picolinate purchased from N21.  Chromium picolinate purchased from other suppliers was not subject to this limited license.

24.      On or about November 22, 2011, N21 Acquisition Holding, LLC purchased certain assets and the Patents-in-Suit from N21, and further retained and employed key employees of N21.  N21 Acquisition Holding, LLC later renamed itself JDS.  By further agreement, Nutrition 21 jointly owns the Patents-in-Suit with JDS.

25.      Plaintiffs have continued the practice of selling Chromax® chromium picolinate by weight with its price dependent upon the volume (weight amount) of Chromax® chromium picolinate purchased by a customer.  As an ingredient supplier, Nutrition 21 sells and has sold Chromax® chromium picolinate to more than one hundred customers who, in many circumstances, upon information and belief, incorporate Chromax® chromium picolinate into multiple product lines and SKUs and even resell Chromax® chromium picolinate to their customers as contract manufacturers.  Nutrition 21 often has no knowledge of the ultimate end use or products in which its Chromax® chromium picolinate is used or incorporated as an ingredient.

26.      To support its sales, Nutrition 21 has sold and continues to sell its Chromax® chromium picolinate according to a business policy and practice that grants its customers a limited license under Nutrition 21's patents to use Chromax® chromium picolinate in their products and for uses covered by the Patents-in-Suit.  The fee for the limited license continues to be bundled on an unallocated basis with the price that Nutrition 21 charges to its customers for the Chromax® chromium picolinate product that Nutrition 21 sells to them.  When a customer purchases Chromax® chromium picolinate from Nutrition 21 it receives a limited license to use and practice the Patents-in-Suit, but only for the specific Chromax® chromium picolinate purchased from Nutrition 21.  Chromium picolinate purchased from other suppliers is and was not subject to this limited license.

27.      Over a period of years, Defendants have purchased Chromax® chromium picolinate from Plaintiffs and/or N21, that upon information and belief, Defendants incorporated into Defendants' nutritional and dietary supplement product lines.  Defendants have purchased Plaintiffs' Chromax® chromium picolinate according to Plaintiffs' standard business practice and policy of incorporating in its price for Chromax® chromium picolinate a limited license under the Patents-in-Suit that runs with only the specific Chromax® chromium picolinate purchased from Plaintiffs.  When purchasing Chromax® chromium picolinate from Plaintiffs and N21, Defendants were granted a limited license under and to the Patents-in-Suit to use the specific Chromax® chromium picolinate product purchased from Plaintiffs and/or N21, but not chromium picolinate received from other suppliers, for the uses and formulations covered by the Patents-in-Suit.

28.      More recently, however, Defendants have purchased very small quantities of Chromax® chromium picolinate from Plaintiffs, while at the same time, upon information and belief, they purchased large quantities of chromium picolinate from other suppliers with knowledge of the Patents-in-Suit, with knowledge that they were combining chromium picolinate from other suppliers with other ingredients such as biotin, ascorbic acid, citric acid, niacinamide and/or nicotinic acid, or their equivalents, in violation of the Patents-in-Suit, and with knowledge of their infringement, but without a license from Plaintiffs to use Plaintiffs' patented technology in Defendants' multi-vitamin and dietary supplement product lines. Defendant's making, using, distribution, offering for sale, sale and/or importation of Defendants multivitamin and dietary supplements purposefully and willfully infringed and continues to willfully infringe the Patents-in-Suit, and/or willfully induced others and continues to willfully induce others to infringe the Patents-in-Suit.

29.     During the course of the business relationship, and at least from late 2011, Plaintiffs and N21 informed Defendants of Plaintiffs' patent portfolio, including the Patents-in-Suit.  In connection with purchases of Plaintiffs' Chromax® chromium picolinate, Plaintiffs distributed and delivered to Defendants its Terms of Use policy, which provided explicit notice of Plaintiffs' patents, including the Patents-in-Suit, at least on May 15, 2013; August 14, 2013; January 1, 2014; and May 27, 2014.

30.     Upon information and belief Defendants purchased and continue to purchase chromium picolinate from a supplier other than Plaintiffs for use in their products.  The chromium picolinate Defendants purchased from other suppliers and used in Defendant's products is chromic tripicolinate.  In addition, a number of Defendants products contain nicotinic acid, ascorbic acid, citric acid and/or biotin, or their equivalents, in combination with the chromium picolinate received from other suppliers and without license from Plaintiffs or N21.

31.     As a result of the relationship between the parties, including the Terms of Use policy provided to Defendants, Defendants were and continue to be aware of Plaintiffs' patent portfolio, and specifically the Patents-in-Suit, which are explicitly identified in the Terms of Use policy.

32.     As a result of previous litigation, on or about March 8, 2014, Pfizer, Inc. settled a patent infringement action with Plaintiffs on its Centrum multi-vitamin product line wherein Pfizer acknowledged the validity of and took a license under the Patents-in-Suit ("Pfizer License").  The Pfizer License agreement entered between Pfizer and Nutrition 21 for the use of chromium picolinate in its Centrum multi-vitamin product line was well publicized in the nutritional supplement market in which Defendants compete, including being reported in the Tan Sheet and Engredea, well known nutritional and dietary supplement trade publications.  On

March 11, 2014, Nutrition 21 sent a copy of a press release to many entities in the nutritional and dietary supplement industry, including Nature's Way and Enzymatic Therapy, that announced the settlement and the license Pfizer received for their Centrum multivitamins under the Patents-in-Suit.

33.      As a result of a previous litigation, on or about April 15, 2014, Church & Dwight entered into a multi-year license with Nutrition 21 under the Patents-in-Suit for the use of chromium picolinate in Church & Dwight's dietary supplements including Vitafusion and L'il Critters nutritional supplements (the "Church & Dwight License").  The Church & Dwight License agreement between Church & Dwight and Nutrition 21 was well publicized in the nutritional supplements market, including being reported in Engredea and Natural Products Insider, well known nutritional and dietary supplement trade publications.  On April 22, 2014, Nutrition 21 sent a copy of a press release to many entities in the nutritional and dietary supplement industry, including Nature's Way and Enzymatic Therapy, that announced the license Church & Dwight received for their Vitafusion and L'il Critters nutritional supplements under the Patents-in-Suit.

34.      As described in more detail below, Defendants engaged in behavior purposely designed and orchestrated to violate Plaintiffs' patent rights.  In so doing, Defendants willfully and intentionally violated and infringed the patent rights owned by Plaintiffs.  As a result of Defendants' actions, Plaintiffs have been severely damaged by Defendants' willful and deliberate infringement of the Patents-in-Suit as described in more detail below.

## COUNT I: INFRINGEMENT OF THE '772 PATENT

35.      Plaintiffs reallege and incorporate herein by reference the preceding paragraphs as though fully set forth herein.

36.     Defendants among other things, make, use, offer for sale, sell, distribute and/or import within the United States multi-vitamins and dietary supplements, such as, for example, products that contain chromium picolinate in combination with niacinamide and/or nicotinic acid.  Exemplary products made and/or sold by Defendants that include chromium picolinate in combination with nicotinic acid and/or niacinamide include a number of the Nature's Way, Alive, Doctor's Choice, Alpha Betic, Integrative Therapeutics and Enzymatic Therapy products, including, but not necessarily limited to, Alive Once Daily Ultra Potency Men's 50+, Alive Once Daily Ultra Potency Men's, Alive Once Daily Ultra Potency, Alive Once Daily Ultra Potency Women's, Alive Once Daily Ultra Potency Women's 50+, Alive Whole Food Energizer Max Potency (no Iron Added), Alive Whole Food Energizer Max Potency, Alive Whole Food Energizer Men's Multi Max Potency, Alive Whole Food Energizer Women's Multi Max Potency, Alive Whole Food Energizer Multi-Vitamin (Vcap), Alive Whole Food Energizer Multi-Vitamin (Vcap, Iron Free), Alive Women's 50+, Alive Men's 50+, Alive Daily Energy, Alive Energy 50+, Alive Energy 50+ (Without Iron), Alive Women's Energy, Alive Men's Energy, Alive Men's Premium Gummy, Alive Women's Premium Gummy, Alpha Betic Multi-Vitamin Plus Extended Energy, Clinical Nutrients For Men (Iron Free Multi), Clinical Nutrients 50-Plus Men, Clinical Nutrients 45-Plus Women, Clinical Nutrients for Women, End Fatigue Daily Energy Enfusion Drink Mix, Mega Multi-Vitamin Powder Mix, Total Formula 2, Total Formula 3 Advanced No Iron Formula, Glycemic Manager, Fatigued to Fantastic Energy Revitalization System, Blood Sugar Manager, Whole Heart Multi-Vitamin, Doctor's Choice 50+ Men, Doctor's Choice Men, Sweet Defense, Doctor's Choice Women, and Doctor's Choice 45+ Women (collectively "Niacin Products").  Discovery may uncover other products made, used, offered for sale, sold, imported, and/or distributed by Defendants that include chromium picolinate in combination with nicotinic

-12-

acid, or its equivalent, that may infringe the '772 patent.  In addition, Defendants among other

things, have created, distributed and continue to create and distribute suggested instructions for

use for such Niacin Products, and have promoted the sale of and sold, now and in the past, and

continue to promote the sale of and sell such Niacin Products to end users and customers.

37.     On information and belief, Defendants directly or indirectly through the actions

of other entities, have infringed, now and in the past, and continue to infringe the '772 patent

directly, indirectly (by inducing infringement by others or contributing to infringement), jointly,

literally and/or equivalently, by, among other things, making, using, selling, offering for sale,

and/or importing into the United States, now and in the past, nutritional supplements and/or

multi-vitamins, including, but not limited to, the Niacin Products that embody, or include

instructions encouraging the practice of, at least one of claims 1, 8 and 15 of the '772 patent.

38.     On information and belief, Defendants have infringed, now and in the past, and

continue to infringe the '772 patent directly, jointly, literally and/or equivalently, by, among

other things, making, using, selling, offering for sale, and/or importing into the United States,

now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to,

the Niacin Products, which contain chromium picolinate in combination with niacinamide and/or

nicotinic acid that embody at least claim 1 of the '772 patent.

39.     On information and belief, end users and consumers take Niacin Products

according to their suggested instructions of orally ingesting them.  End users and consumers

have infringed, now and in the past, and continue to infringe at least one of claims 1, 8 and 15 of

the '772 patent directly, jointly, literally and/or by equivalents by using the Niacin Products in

the United States in a manner that practices at least one of claims 1, 8 and 15 of the '772 patent.

-13-

40.     On information and belief, Defendants had and continue to have actual and constructive knowledge of and are aware of the Patents-in-Suit, including the '772 patent. Plaintiffs have provided explicit written notice of the '772 patent to Defendants on numerous occasions since at least 2013.

41.     With knowledge of the '772 patent and the specific intent to encourage, promote, instruct, contribute to and induce the infringement of the '772 patent, Defendants have infringed, now and in the past, and continue to infringe at least one of claims 1, 8 and 15 of the '772 patent, indirectly, jointly, literally and/or by equivalents, by, among other things, encouraging, promoting, instructing, teaching, contributing to and inducing end users and customers to infringe at least one of claims 1, 8 and 15 of the '772 patent by, among other things, (1) making, using, offering for sale, selling, distributing, marketing and importing within the United States the Niacin Products, and (2) creating and distributing suggested instructions for use and promotional advertising materials that Defendants knew, and continue to know, encourage, promote, instruct, teach, contribute to and induce use of the Niacin Products in a manner that Defendants knew, and continue to know, practices at least one of claims 1, 8 and 15 of the '772 patent.  For example, Defendants, with knowledge of the '772 patent, make, offer for sale, sell and/or import into the United States the Niacin Products, and created, provided, and continue to create and provide, instructions of use for consumers of its Niacin Products, and otherwise promote such products, such that customers and end users orally take and use the Niacin Products according to Defendants' instructions and in a manner that Defendants knew, and continue to know, practices of at least one of claims 1, 8 and 15 of the '772 patent.

42.     On information and belief, Defendants nutritional supplements and/or multi-vitamins, including but not limited to, the Niacin Products, are specifically made to be taken

orally, are a material part of the method of at least one of claims 8 and 15 of the '772 patent, and are not staple articles nor commodities of commerce suitable for substantial non-infringing uses.

43.     At the very least, Defendants were willfully blind as to the existence of the '772 patent, and/or willfully blinded themselves to end users direct infringement of the '772 patent as a result of their use of the Niacin Products in a manner that follows the suggested use of the Niacin Products, whereby the Defendants' instructions and promotional activities encourage, promote, instruct, and teach methods and uses that meet at least the limitations of at least one of claims 1, 8 and 15 of the '772 patent.

44.     On information and belief, Defendants knew of the '772 patent, ignored and/or disregarded that their actions constituted infringement of a valid patent, and acted despite an objectively high likelihood that their actions constituted infringement of the '772 patent, and therefore Defendants infringement is and has been willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. §§ 284 and 285.

45.     Defendants' acts have caused and will continue to cause irreparable harm and injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

46.     Unless preliminarily and permanently enjoined, Defendants have been and will continue to infringe the '772 patent to Plaintiffs' substantial and irreparable harm.

**COUNT II: INFRINGEMENT OF THE '317 PATENT**

47.     Plaintiffs reallege and incorporate herein by reference the preceding paragraphs as though fully set forth herein.

48.     Defendants, among other things, make, use, offer for sale, sell, distribute and/or import within the United States multi-vitamins and dietary supplements, such as, for example, products that contain chromium picolinate in combination with niacinamide and/or nicotinic acid.  Exemplary products made and/or sold by Defendants that include chromium

-15-

picolinate in combination with nicotinic acid and/or niacinamide include, but are not necessarily limited to, the Niacin Products.  Discovery may uncover other products made, used, offered for sale, sold, distributed and/or imported by Defendants that include chromium picolinate in combination with nicotinic acid, or its equivalent, that may infringe the '317 patent.  In addition, Defendants among other things, have created, distributed and continue to create and distribute suggested instructions for use for such Niacin Products, and have promoted the sale of and sold, now and in the past, and continue to promote the sale of and sell such Niacin Products to end users and customers.

49.      On information and belief, Defendants directly or indirectly through the actions of other entities, have infringed, now and in the past, and continue to infringe the '317 patent directly, indirectly (by inducing infringement by others or contributing to infringement), jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Niacin Products that embody, or include instructions encouraging the practice of, at least one of claims 12, 33 and 49 of the '317 patent.

50.      On information and belief, Defendants have infringed, now and in the past, and continue to infringe the '317 patent directly, jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Niacin Products, which contain chromium picolinate in combination with niacinamide and/or nicotinic acid that embody at least claim 12 of the '317 patent.

51.      On information and belief, end users and consumers take the Niacin Products according to their suggested instructions of orally ingesting them.  End users and consumers

have infringed, now and in the past, and continue to infringe at least one of claims 12, 33 and 49 of the '317 patent directly, jointly, literally and/or by equivalents by using the Niacin Products in the United States in a manner that practices at least one of claims 12, 33 and 49 of the '317 patent.

52.     On information and belief, Defendants had and continue to have actual and constructive knowledge of and are aware of the Patents-in-Suit, including the '317 patent. Plaintiffs have provided explicit written notice of the '317 patent to Defendants on numerous occasions since 2013.

53.     With knowledge of the '317 patent and the specific intent to encourage, promote, instruct, contribute to and induce the infringement of the '317 patent, Defendants have infringed, now and in the past, and continue to infringe at least one of claims 12, 33 and 49 of the '317 patent, indirectly, jointly, literally and/or by equivalents, by, among other things, encouraging, promoting, instructing, teaching, contributing to and inducing end users and customers to infringe at least one of claims 12, 33 and 49 of the '317 patent by, among other things, (1) making, using, offering for sale, selling, distributing, marketing and importing within the United States the Niacin Products, and (2) creating and distributing suggested instructions for use and promotional advertising materials that Defendants knew, and continue to know, encourage, promote, instruct, teach, contribute to and induce use of the Niacin Products in a manner that Defendants knew, and continue to know, practices at least one of claims 12, 33 and 49 of the '317 patent.  For example, Defendants with knowledge of the '317 patent, make, offer for sale, sell and/or import into the United States the Niacin Products, and created, provided, and continue to create and provide. instructions of use for consumers of its Niacin Products, and otherwise promotes such products, such that customers and end users orally take and use the

Niacin Products according to Defendants' instructions and in a manner that Defendants knew, and continue to know, practices at least one of claims 12, 33 and 49 of the '317 patent.

54.    On information and belief, Defendants' nutritional supplements and/or multi-vitamins, including but not limited to, the Niacin Products, are specifically made to be taken orally, are a material part of the method of at least one of claims 33 and 49 the '317 patent and are not staple articles nor commodities of commerce suitable for substantial non-infringing uses.

55.    At the very least, Defendants were willfully blind as to the existence of the '317 patent, and/or willfully blinded themselves to end users direct infringement of the '317 patent as a result of their use of the Niacin Products in a manner that follows the suggested use of the Niacin Products, whereby the Defendants' instructions and promotional activities encourage, promote, instruct, and teach methods and uses that meet at least the limitations of at least one of claims 12, 33 and 49 of the '317 patent.

56.    On information and belief, Defendants knew of the '317 patent, ignored and/or disregarded that their actions constituted infringement of a valid patent, and acted despite an objectively high likelihood that their actions constituted infringement of the '317 patent, and therefore Defendants infringement is and has been willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. §§ 284 and 285.

57.    Defendants' acts have caused and will continue to cause irreparable harm and injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

58.    Unless preliminarily and permanently enjoined, Defendants have been and will continue to infringe the '317 patent to Plaintiffs' substantial and irreparable harm.

**COUNT III: INFRINGEMENT OF THE '889 PATENT**

59.    Plaintiffs reallege and incorporate herein by reference the preceding paragraphs as though fully set forth herein.

-18-

60.     Defendants, among other things, make, use, offer for sale, sell, distribute and/or import within the United States multi-vitamins and dietary supplements, such as for example, products that contain chromium picolinate in combination with niacinamide and/or nicotinic acid.  Exemplary products made and/or sold by Defendants that include chromium picolinate in combination with nicotinic acid and/or niacinamide include, but are not necessarily limited to, the Niacin Products.  Discovery may uncover other products made, used, offered for sale, sold, distributed and/or imported by Defendants that include chromium picolinate in combination with nicotinic acid, or its equivalent, that may infringe the '889 patent.  In addition, Defendants, among other things, have created, distributed and continue to create and distribute suggested instructions for use for such Niacin Products, and have promoted the sale of and sold, now and in the past, and continue to promote the sale of and sell such Niacin Products to end users and customers.

61.     On information and belief, Defendants directly or indirectly through the actions of other entities, have infringed, now and in the past, and continue to infringe the '889 patent directly, indirectly (by inducing infringement by others or contributing to infringement), jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Niacin Products that embody, or include instructions encouraging the practice of, at least claim 9 of the '889 patent.

62.     On information and belief, Defendants and their predecessor entities have infringed, now and in the past, and continue to infringe at least claim 9 the '889 patent directly, jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or

-19-

multi-vitamins, including, but not limited to, the Niacin Products that contain chromium

picolinate in combination with niacinamide and/or nicotinic acid.

63.     On information and belief, end users and consumers take the Niacin Products

according to their suggested instructions of orally ingesting them.  End users and consumers

have infringed, now and in the past, and continue to infringe at least claim 9 of the '889 patent

directly, jointly, literally and/or by equivalents by using the Niacin Products in the United States

in a manner that practices at least claim 9 of the '889 patent.

64.     On information and belief, Defendants have and continue to have actual and

constructive knowledge of and are aware of the Patents-in-Suit, including the '889 patent.

Plaintiffs have provided explicit written notice of the '889 patent to Defendants on numerous

occasions since 2013.

65.     With knowledge of the '889 patent and the specific intent to encourage,

promote, instruct, contribute to and induce the infringement of the '889 patent, Defendants have

infringed, now and in the past, and continue to infringe at least claim 9 of the '889 patent,

indirectly, jointly, literally and/or by equivalents, by, among other things, encouraging,

promoting, instructing, teaching, contributing to and inducing end users and customers to

infringe at least claim 9 of the '889 patent by, among other things, (1) making, using, offering for

sale, selling, distributing, marketing and importing within the United States Niacin Products, and

(2) creating and distributing suggested instructions for use and promotional advertising materials

that Defendants knew, and continue to know, encourage, promote, instruct, teach, contribute to

and induce use of the Niacin Products in a manner that Defendants knew, and continue to know,

practices the method of at least claim 9 of the '889 patent.  For example, Defendants, with

knowledge of the '317 patent, make, offer for sale, sell and/or import into the United States the

Niacin Products, and created, provided, and continue to create and provide, instructions of use for consumers of its Niacin Products, and otherwise promote such products, such that customers and end users orally take and use the Niacin Products according to Defendants' instructions and in a manner that Defendants knew, and continue to know, practice at least the method of claim 9 of the '889 patent.

66.    On information and belief, Defendants' nutritional supplements and/or multi-vitamins, including but not limited to, the Niacin Products are specifically made to be taken orally, are a material part of the method of at least claim 9 of the '889 patent, and are not staple articles nor commodities of commerce suitable for substantial non-infringing uses.

67.    At the very least, Defendants were willfully blind as to the existence of the '889 patent, and/or willfully blinded themselves to end users direct infringement of the '889 patent as a result of their use of the Niacin Products in a manner that follows the suggested use of the Niacin Products, whereby the Defendants' instructions and promotional activities encourage, promote, instruct, and teach methods and uses that meet at least the limitations of claim 9 of the '889 patent.

68.    On information and belief, Defendants knew of the '889 patent, ignored and/or disregarded that their actions constituted infringement of a valid patent, and acted despite an objectively high likelihood that their actions constituted infringement of the '889 patent, and therefore Defendants infringement is and has been willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. §§ 284 and 285.

69.    Defendants' acts have caused and will continue to cause irreparable harm and injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

-21-

70.     Unless preliminarily and permanently enjoined, Defendants have been and will continue to infringe the '889 patent to Plaintiffs' substantial and irreparable harm.

## COUNT IV: INFRINGEMENT OF THE '301 PATENT

71.     Plaintiffs reallege and incorporate herein by reference the preceding paragraphs as though fully set forth herein.

72.     Defendants, among other things, make, use, offer for sale, sell, distribute and/or import within the United States multi-vitamins and dietary supplements, such as for example, products that contain chromium picolinate in combination with ascorbic acid or citric acid.  Exemplary Products made and/or sold by Defendants that include chromium picolinate in combination with ascorbic acid and/or citric acid include a number of Nature's Way, Alive, Doctor's Choice, Integrative Therapeutics and Enzymatic Therapy products, including, but not necessarily limited to, Alive Once Daily Ultra Potency Men's 50+, Alive Once Daily Ultra Potency Men's, Alive Once Daily Ultra Potency, Alive Once Daily Ultra Potency Women's, Alive Once Daily Ultra Potency Women's 50+, Alive Whole Food Energizer Max Potency (no Iron Added), Alive Whole Food Energizer Max Potency, Alive Whole Food Energizer Men's Multi Max Potency, Alive Whole Food Energizer Women's Multi Max Potency, Alive Whole Food Energizer Multi-Vitamin (Vcap), Alive Whole Food Energizer Multi-Vitamin (Vcap, Iron Free), Alive Women's 50+, Alive Men's 50+, Alive Daily Energy, Alive Energy 50+, Alive Energy 50+ (Without Iron), Alive Women's Energy, Alive Men's Energy, Alive Men's Premium Gummy, Alive Women's Premium Gummy, Alpha Betic Multi-Vitamin Plus Extended Energy, End Fatigue Daily Energy Infusion Drink Mix, Mega Multi-Vitamin Powder Mix, Total Formula 2, Total Formula 3 Advanced No Iron Formula, Clinical Nutrients for Diabetics, Fatigued to Fantastic Energy Revitalization System, Doctor's Choice for Diabetics, Whole Heart Multi-Vitamin and Sweet Defense (collectively "Acid Products").  Discovery may uncover other

-22-

products made, used, offered for sale, sold, distributed and/or imported by Defendants that include chromium picolinate in combination with ascorbic acid and/or citric acid, or their equivalents, that may infringe the '301 patent.  In addition, Defendants, among other things, have created, distributed and continue to create and distribute suggested instructions for use for such Acid Products, and have promoted the sale of and sold, now and in the past, and continue to promote the sale of and sell such Acid Products to end users and customers.

73.     On information and belief, Defendants directly or indirectly through the actions of other entities, have infringed, now and in the past, and continue to infringe the '301 patent directly, indirectly (by inducing infringement by others or contributing to infringement), jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Acid Products that embody, or include instructions encouraging the practice of, at least one of claims 21, 27 and 33 of the '301 patent.

74.     On information and belief, Defendants have infringed, now and in the past, and continue to infringe the '301 patent directly, jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Acid Products, which contain chromium picolinate in combination with ascorbic acid or citric acid that embody at least claim 21 of the '301 patent.

75.     On information and belief, end users and consumers take the Acid Products according to their suggested instructions of orally ingesting them.  End users and consumers have infringed, now and in the past, and continue to infringe at least one of claims 21, 27 and 33 of the '301 patent directly, jointly, literally and/or by equivalents by using the Acid Products in

-23-

the United States in a manner that practices at least one of claims 21, 27 and 33 of the '301 patent.

76.     On information and belief, Defendants had and continue to have actual and constructive knowledge of and are aware of the Patents-in-Suit, including the '301 patent. Plaintiffs have provided explicit written notice of the '301 patent to the Defendants on numerous occasions since 2013.

77.     With knowledge of the '301 patent and the specific intent to encourage, promote, instruct, contribute to and induce the infringement of the '301 patent, Defendants have infringed, now and in the past, and continue to infringe at least one of claims 21, 27 and 33 of the '301 patent, indirectly, jointly, literally and/or by equivalents, by, among other things, encouraging, promoting, instructing, teaching, contributing to and inducing end users and customers to infringe at least one of claims 21, 27 and 33 of the '301 patent by, among other things, (1) making, using, offering for sale, selling, distributing, marketing and importing within the United States the Acid Products, and (2) creating and distributing suggested instructions for use and promotional advertising materials that Defendants knew, and continue to know, encourage, promote, instruct, teach, contribute to and induce use of the Acid Products in a manner that Defendants knew, and continue to know, practices at least one of claims 21, 27 and 33 of the '301 patent.  For example, Defendants, with knowledge of the '301 patent, make, offer for sale, sell and/or import into the United States the Acid Products, and created, provided, and continue to create and provide, instructions of use for consumers of its Acid Products, and otherwise promote such products, such that customers and end users orally take and use the Acid Products according to Defendants' instructions and in a manner that Defendants knew, and continue to know, practices at least one of claims 21, 27 and 33 of the '301 patent.

-24-

78.      On information and belief, Defendants' nutritional supplements and/or multi-vitamins, including but not limited to, the Acid Products, are specifically made to be taken orally, are a material part of the method of at least one of claims 27 and 33 of the '301 patent, and are not staple articles nor commodities of commerce suitable for substantial non-infringing uses.

79.      At the very least, Defendants were willfully blind as to the existence of the '301 patent, and/or willfully blinded themselves to end users direct infringement of the '301 patent as a result of their use of the Acid Products in a manner that follows the suggested use of the Acid Products, whereby the Defendants' instructions and promotional activities encourage, promote, instruct, and teach methods and uses that meet at least the limitations of at least one of claims 21, 27 and 33 of the '301 patent.

80.      On information and belief, Defendants knew of the '301 patent, ignored and/or disregarded that their actions constituted infringement of a valid patent, and acted despite an objectively high likelihood that their actions constituted infringement of the '301 patent, and therefore Defendants infringement is and has been willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. §§ 284 and 285.

81.      Defendants acts have caused and will continue to cause irreparable harm and injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

82.      Unless preliminarily and permanently enjoined, Defendants have been and will continue to infringe the '301 patent to Plaintiffs' substantial and irreparable harm.

### COUNT V: INFRINGEMENT OF THE Re '480 PATENT

83.      Plaintiffs reallege and incorporate herein by reference the preceding paragraphs as though fully set forth herein.

84.     Defendants, among other things, make, use, offer for sale, sell, distribute and/or import within the United States multi-vitamins and dietary supplements, such as for example, the products that contain chromium picolinate in combination with Biotin.  Exemplary products made and/or sold by Defendants that include chromium picolinate in combination with Biotin include a number of the Nature's Way, Alive, Doctor's Choice, Enzymatic Therapeutics and Integrative Therapy products, including, but not necessarily limited to, Alive Once Daily Ultra Potency Men's 50+, Alive Once Daily Ultra Potency Men's, Alive Once Daily Ultra Potency, Alive Once Daily Ultra Potency Women's, Alive Once Daily Ultra Potency Women's 50+, Alive Whole Food Energizer Max Potency (no Iron Added), Alive Whole Food Energizer Max Potency, Alive Whole Food Energizer Men's Multi Max Potency, Alive Whole Food Energizer Women's Multi Max Potency, Alive Whole Food Energizer Multi-Vitamin (Vcap), Alive Whole Food Energizer Multi-Vitamin (Vcap, Iron Free), Alive Women's 50+, Alive Men's 50+, Alive Daily Energy, Alive Energy 50+, Alive Energy 50+ (Without Iron), Alive Women's Energy, Alive Men's Energy, Alive Men's Premium Gummy, Alive Women's Premium Gummy, Alpha Betic Multi-Vitamin Plus Extended Energy, Clinical Nutrients for Men, Clinical Nutrients 50-Plus Men, Clinical Nutrients 45-Plus Women, Clinical Nutrients for Women, Total Formula 2, Total Formula 3 Advanced No Iron Formula, Clinical Nutrients for Diabetics, Glycemic Manager, Glycation Manager, Doctor's Choice for Diabetics, Blood Sugar Manager, Whole Heart Multi-Vitamin, Doctor's Choice 50+ Men, Doctor's Choice Men, Doctor's Choice Women, and Doctor's Choice 45+ Women (collectively "Biotin Products").  Discovery may uncover other products made, used, offered for sale, sold, distributed and/or imported by Defendants that include chromium picolinate in combination with biotin, or its equivalents, that may infringe the '480 patent.  In addition, Defendants, among other things, have created, and distributed and

continue to create and distribute suggested instructions for use for such Biotin Products, and have promoted the sale of and sold, now and in the past, and continue to promote the sale of and sell such Biotin Products to end users and customers.

85.     On information and belief, Defendants, directly or indirectly through the actions of other entities, have infringed, now and in the past, and continue to infringe the Re '480 patent directly, indirectly (by inducing infringement by others or contributing to infringement), jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale, and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Biotin Products that embody, and include instructions encouraging the practice of, at least one of claims 1, 10 and 11 of the Re '480 patent.

86.     On information and belief, Defendants have infringed, now and in the past, and continue to infringe the Re '480 patent directly, jointly, literally and/or equivalently, by, among other things, making, using, selling, offering for sale and/or importing into the United States, now and in the past, nutritional supplements and/or multi-vitamins, including, but not limited to, the Biotin Products, which contain chromium picolinate in combination with Biotin that embody at least claim 10 of the Re '480 patent.

87.     Upon information and belief, end users and consumers take the Biotin Products according to their suggested instructions of orally ingesting them.  End users and customers have infringed, now and in the past, and continue to infringe at least one of claims 1, 10 and 11 of the Re '480 patent directly, jointly, literally and/or by equivalents by, among other things, orally taking and using the Biotin Products in a manner that practices at least one of claims 1, 10 and 11 of the Re '480 patent.

88.     On information and belief, Defendants had and continue to have actual and constructive knowledge of and are aware of the Patents-in-Suit, including the Re '480 patent. Plaintiffs have provided explicit written notice of the Re '480 patent to Defendants on numerous occasions since at least 2013.

89.     With knowledge of the Re '480 patent and the specific intent to encourage, promote, instruct, contribute to and induce the infringement of the Re '480 patent, Defendants have infringed, now and in the past, and continue to infringe at least one of claims 1, 10 and 11 of the Re '480 patent, indirectly, jointly, literally and/or by equivalents, by, among other things, encouraging, promoting, instructing, teaching, contributing to and inducing end users and customers to infringe at least one of claims 1, 10 and 11 of the Re '480 patent by, among other things, (1) making, using, offering for sale, selling, distributing, marketing and importing within the United States the Biotin Products, and (2) creating and distributing suggested instructions for use and promotional advertising materials that Defendants knew, and continue to know, encourage, promote, instruct, teach, contribute to and induce use of the Biotin Products in a manner that Defendants knew, and continue to know, practices at least claims 1, 10 and 11 of the Re '480 patent.  For example, Defendants with knowledge of Re '480 patent, make, offer for sale, sell and/or import into the United States the Biotin Products, and created, provided, and continue to create and provide, instructions for use to consumers for its Biotin Products, and otherwise promote such products, such that customers and end users orally take and use these Biotin Products according to Defendants' instructions in a manner that Defendants knew, and continue to know, practices at least one of claims 1, 10 and 11 of the Re '480 patent.

90.     On information and belief, Defendants' nutritional supplements and/or multi-vitamins, including but not limited to, the Biotin Products are specifically made to be taken

orally, are a material part of at least one of claims 1 and 11 of the Re '480 patent, and are not staple articles nor commodities of commerce suitable for substantial non-infringing uses.

91.      At the very least, Defendants were willfully blind as to the existence of the Re '480 patent, and/or willfully blinded themselves to end users direct infringement of the Re '480 patent as a result of their use of the Biotin Products in a manner that follows the suggested use of the Biotin Products, whereby the Defendants' instructions and promotional activities encourage, promote, instruct, and teach methods that meet at least the limitations of at least one of claims 1, 10 and 11 of the Re '480 patent.

92.      On information and belief, Defendants know of the Re '480 patent, ignored and/or disregarded that their actions constituted infringement of a valid patent, and acted despite an objectively high likelihood that their actions constituted infringement of the Re '480 patent, and therefore Defendants' infringement is and has been willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. §§ 284 and 285.

93.      Defendants' acts have caused and will continue to cause irreparable harm and injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

94.      Unless preliminarily and permanently enjoined, Defendants have been and will continue to infringe the Re '480 patent to Plaintiffs' substantial and irreparable harm.

**DAMAGES AND RELIEF**

95.      Defendants' infringement of the Patents-in-Suit has caused Plaintiffs irreparable harm for which there is no adequate remedy at law.

96.      Furthermore, as a consequence of Defendants' infringement of the Patents-in-Suit, Plaintiffs have suffered damages in an amount not yet determined, and which will be determined at trial, for the infringement committed within six years prior to the filing of this Complaint, and any further damages for infringement committed after filing of the Complaint

(the 'Damages Period"), and that at a minimum Plaintiffs are entitled to a reasonable royalty during the Damages Period.

97.        This is an exceptional case as that term is used in 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment against Defendants:

a)   Determining that Defendants have infringed and continues to infringe one or more claims of the '772 patent;

b)   Determining that Defendants have infringed and continues to infringe one or more claims of the '317 patent;

c)   Determining that Defendants have infringed and continues to infringe one or more claims of the '889 patent;

d)   Determining that Defendants have infringed and continues to infringe one or more claims of the '301 patent;

e)   Determining that Defendants have infringed and continues to infringe one or more claims of the Re '480 patent;

f)   Permanently enjoining Defendants, its respective officers, agents, servants, directors, employees and attorneys, and all persons acting in concert or participation with it, directly or indirectly, or any of them who receive actual notice of the judgment, from further infringing the Patents-in-Suit, including enjoining the making, using, offer for sale, sale, distribution and/or importation of the infringing products;

g)   Ordering Defendants to recall all infringing products not yet sold to an end user, and further requiring Defendants to publicize such recall;

h)  Ordering Defendants to account for and pay to Plaintiffs all past, present and future damages suffered by Plaintiffs during the Damages Period as a consequence of Defendants' infringement of the Patents-in-Suit, together with interest and costs as fixed by the Court;

i)  Ordering Defendants to pay to Plaintiffs on-going royalties to compensate Plaintiffs for any further direct or indirect infringement by Defendants of any claim of the Patents-in-Suit;

j)  Trebling or otherwise increasing Plaintiffs' damages under U.S.C. § 284 on the grounds that Defendants' infringement of the Patents-in-Suit was deliberate and willful;

k)  Declaring that this case is exceptional and awarding Plaintiffs its costs and attorneys' fees in accordance with 35 U.S.C. § 285; and

l)  Granting Plaintiffs such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury for all issues so triable.

Dated:  January 16, 2015

Respectfully Submitted,

By: _____
Brian M. Rothery
Joseph Diamante
**STROOCK & STROOCK & LAVAN LLP**
180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-5400

*Attorneys for Plaintiffs*
*JDS Therapeutics, LLC and Nutrition 21, LLC*

-31-